## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| **Sharon Teal, Individually and as** § | | |
| **Administrator of the Estate of** § | | |
| **Mattie Coleman** § | | |
| § | | |
| **Plaintiff,** § | **Cause No.** | |
| § | | |
| **V.** § | **Jury Trial Requested** | |
| § | | |
| **Invacare Corporation** § | | |
| § | | |
| **Defendant.** § | | |

_____

### Plaintiff Sharon Teal's Original Complaint
_____

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Plaintiff Sharon Teal, individually and as administrator of the estate of Mattie Coleman, files this her Original Complaint against Invacare Corporation and in support thereof shows as follows:

### Parties

1. Plaintiff Sharon Teal is an individual who is a citizen of the State of Texas.

2. Defendant Invacare Corporation is a corporation, which is incorporated under the laws of Ohio and which maintains its principal place of business at One Invacare Way, Elyria, Ohio 44035. Invacare may be served by serving its registered agent, CT Corporation System, at its registered agent's office at 1999 Bryan St., Ste. 900, Dallas, Texas 75201. Defendant's counsel David Macdonald has also agreed to accept service at his office at Macdonald Devin P.C., 3800 Renaissance Tower, 1201 Elm Street, Dallas, Texas 75270.

**Jurisdiction and Venue**

3. This Court has diversity jurisdiction over the lawsuit under 28 U.S.C. § 1332(a)(1) because Plaintiff and Defendant are citizens of different states and the amount in controversy exceeds $75,000, excluding interest and costs.

4. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred in this district. Specifically, the fire that caused the injuries at issue in this lawsuit occurred in this district.

**Factual Background**

5. This suit arises from a fire that occurred on June 23, 2013 at the residence of Sharon Teal and her mother, Mattie Coleman. Ms. Teal and Ms. Coleman lived together at 719 Georgia Oak, Nacogdoches, Texas.

6. Ms. Teal's health issues required the use of a motorized wheelchair, which she kept in her home.

7. Invacare manufactured Ms. Teal's wheelchair.

8. Upon information and belief, the wheelchair was an Invacare model no. M51PSR20R, with serial no. 11DSZ210059, which Ms. Teal acquired in approximately May of 2012 from Choice HealthCare, Inc.

9. Invacare was, at the time of this occurrence, and is now engaged in the business of designing and manufacturing motorized wheelchairs, including the wheelchair at issue, for sale to and for use by members of the general public. Invacare placed the wheelchair into the stream of commerce by providing it to Choice HealthCare, Inc. for sale.

10. On June 23, 2013, the wheelchair remained in substantially the same condition as it was when purchased and, upon information and belief, upon departure from Invacare's manufacturing facilities.

11. That day, the wheelchair was charging in a bedroom while Ms. Coleman slept in a nearby bedroom. This manner of use was foreseen by Invacare, who designed the wheelchair to run on rechargeable batteries.

12. Ms. Teal was in the kitchen cooking when she noticed the smell of smoke.

13. Upon investigation, Ms. Teal discovered that the smoke was the result of a fire emanating from the wheelchair.

14. She and her mother attempted to escape the home but were each overwhelmed. The fire department rescued both women, who were transported to Nacogdoches Memorial Hospital. Thereafter, each were life-flighted to Parkland Hospital in Dallas, Texas.

15. After undergoing treatment, Ms. Teal was able to return to her mother's side in the hospital. But, because Ms. Teal was homeless and in need, as a result of the fire, she was only able to return to the hospital due to the generous donations of members of her community. Even then, she was only able to remain by her mother's side by sleeping in the waiting room of Ms. Coleman's hospital. She lived off a bag of chips per day and possessed only a single change of clothes. To maintain her personal hygiene, Ms. Teal bathed herself in the hospital's bathroom sink and washed her one extra pair of clothing in the same sink. This living arrangement continued for approximately two months, until Ms. Coleman passed away.

16. During the two months prior to the time she passed away, Ms. Coleman experienced tremendous pain. Though she was unconscious when the first responders arrived, she regained consciousness and was responsive en route to the hospital. She sustained significant

inhalation injury and 20-29% total body surface area full and partial thickness flame burns, including third degree burns, to her legs, her left arm, her right hand and her back.

17. After admittance to the hospital on June 23, 2013, Ms. Coleman remained in the hospital for 55 days until her death on August 17, 2013. During her stay at the hospital, she underwent multiple painful dressing changes, including debridement procedures, tangential excisions and skin grafting procedures, some of which had to be performed under anesthesia to attempt to minimize the pain. Even at times when she was sedated and given pain medications, Ms. Coleman expressed to others the pain she experienced.

18. Investigation by the fire marshal, following the fire, confirmed that the fire originated in the wheelchair.

19. As the result of a design, manufacturing and/or marketing defect, excessive currents in the wheelchair's wiring overwhelmed and overheated the wiring and then ignited the plastic covering and/or other flammable material, which in turn caused a fire that spread to the bed and the rest of the home, causing Ms. Teal's injuries and Ms. Coleman's injuries and death. Neither Ms. Teal, nor her mother, were warned that there was a risk that Ms. Teal's wheelchair could potentially catch on fire. Invacare, however, understood the risk because it had been informed repeatedly about its quality control problems and, more importantly, about other fires originating from its wheelchairs and other products. Indeed, it had entered into a consent decree that limited its production of wheelchairs at one of its Ohio facilities due to quality control problems alleged by the FDA.

20. A safer alternative design was available to Invacare. Other manufacturers produce wheelchairs that do not catch on fire, a result easily preventable. Further, self-igniting wheelchairs are unexpected from the standpoint of a purchaser and/or end user. Specifically, but

not exclusively, Invacare could have eliminated pinch points in the wiring, used wiring sufficient to handle the currents involved in a product of this nature, used fire retardant materials, designed the wheelchair to use and/or produce less current and/or designed an appropriate circuit breaker system to prevent excess currents.

## Causes of Action

21.     **Strict Products Liability**. Invacare designed, manufactured, sold and/or placed into the stream of commerce the wheelchair at issue in this lawsuit. The wheelchair was defective and unsafe for its intended purpose at the time it left Invacare's control, in that it had the potential to ignite and catch fire. The defect rendered the wheelchair unreasonably dangerous, in that it was dangerous to an extent beyond that which would be contemplated by the ordinary user of the product, with the ordinary knowledge common to the community as to the product's characteristics. The defect was the producing and proximate cause of Ms. Teal's injuries and Ms. Coleman's injuries and death.

22.     The wheelchair reached Ms. Teal without substantial change in its condition from the time it was originally sold.

23.     The defect was the result of a design defect in that a condition of the wheelchair rendered it unreasonably dangerous (i.e. likely to catch on fire) as designed, taking into consideration the utility of the wheelchair and the risk involved in its use.

24.     Collectively or alternatively, the defect was the result of a manufacturing defect in that the wheelchair deviated in its construction or quality from its specifications or planned output in a manner that rendered it unreasonably dangerous.

25.     The defect also constitutes a marketing defect, as Invacare (1) failed to provide adequate warnings of the wheelchair's dangers that were known or by the application of

5

reasonably developed human skill and foresight should have been known or (2) failed to give adequate instructions to avoid such dangers, which failures rendered the product unreasonably dangerous as marketed.

26. As set forth above, a safer alternative design was available in the form of a motorized wheelchair that would not have caught on fire. Such an alternative design would have prevented or significantly reduced the risk of the occurrence or injury in question without substantially impairing the product's utility and was economically and technologically feasible at the time the product left the control of Invacare by the application of existing reasonably achievable scientific knowledge.

27. **Negligence**. Invacare breached its duty of care to the plaintiff by designing, manufacturing and/or marketing a wheelchair that had a defect in its design, manufacture and/or marketing as set forth above. Invacare's negligence in designing, manufacturing and/or marketing a wheelchair with the defect that created the potential for ignition proximately caused Plaintiff's damages. Furthermore, the FDA has voiced specific concerns with Invacare's "failure to establish and maintain adequate procedures to analyze processes, work operations, concessions, quality audit reports, quality records, service records, complaints, returned product, and other sources of quality data to identify existing and potential causes of nonconforming product or other quality problems and to employ appropriate statistical methodology where necessary to detect recurring quality problems." As such, upon information and belief, Invacare has breached its duty of care to the plaintiff by engaging in negligent supervision/training of its employees in areas, including but not limited to, quality control resulting in the defective condition of the applicable wheelchair.

28.     **Gross Negligence**. Invacare's actions and/or omissions, when viewed from an objective defendant's standpoint, involved an extreme degree of risk. Despite its actual, subjective awareness of that risk, Invacare proceeded with a conscious indifference to the rights, safety and welfare of Ms. Teal, Ms. Coleman and others. Specifically, but not exclusively, Invacare was aware that manufacturing a wheelchair that catches on fire is likely to injure and/or kill its users, particularly given the ambulatory difficulties of people who require wheelchairs. Notwithstanding that knowledge and the knowledge that its wheelchairs could catch on fire, Invacare continued to design, manufacture, market and distribute it wheelchairs.

29.     *Res ipsa loquitur*. In the alternative, Plaintiff intends to rely upon the doctrine of *res ipsa loquitur*, which is applicable because the facts and circumstances giving rise to Plaintiff's injuries and damages clearly could not have occurred but for the negligence of Defendant.

30.     **Breach of Implied Warranty of Merchantability**. In addition, Invacare impliedly warranted to the public generally and specifically to Ms. Teal and Ms. Coleman that the wheelchair was of merchantable quality and was safe and fit for the purpose intended when used under ordinary circumstances and in an ordinary manner. Invacare was a merchant with respect to the wheelchair in question and the wheelchair was not merchantable as warranted, in that it had a proclivity to ignite and injure or kill its users and/or others.

31.     Plaintiff suffered injuries and damages as a proximate result of the breach of the foregoing warranty.

32.     As set forth above, a safer alternative design was available in the form of a motorized wheelchair that would not have caught on fire. Such an alternative design would have prevented or significantly reduced the risk of the occurrence or injury in question without

substantially impairing the product's utility and was economically and technologically feasible at the time the product left the control of Invacare by the application of existing reasonably achievable scientific knowledge.

### Individual Damages

33. As a result of Invacare's actions and omissions, Ms. Teal suffered the following damages:

   a. Physical pain and mental anguish in the past and future;

   b. Loss of earning capacity in the past and future;

   c. Disfigurement in the past and future;

   d. Physical impairment in the past and future;

   e. Medical expenses in the past and future; and

   f. Property damages.

### Wrongful Death and Survival

34. In addition to her property damage and personal injury claims, Ms. Teal brings this action as administrator of Mattie Coleman's estate and as her surviving child pursuant to Texas Civil Practice and Remedies Code § 71.021, known as the "Survivor's Act," Texas Civil Practice and Remedies Code §§ 71.002-004, commonly referred to as the "Wrongful Death Act," and any and all other applicable laws including Texas Common Law.

35. On behalf of the Estate of Mattie Coleman, deceased, her heir, Sharon Teal, seeks damages for Mattie Coleman's pain and suffering, mental anguish, medical bills and funeral expenses, all of which were proximately caused by the product defect, negligence, warranty breach and gross negligence of Invacare.

36. As the surviving daughter of Mattie Coleman, deceased, Sharon Teal seeks the following damages that were proximately caused by the product defect, negligence and gross negligence of Invacare: (a) pecuniary loss, including loss of care, maintenance, support, services, advice, counsel and reasonable contributions of pecuniary value, in the past and future, that Mattie Coleman would, in reasonable probability, have provided had she lived; (b) loss of companionship and society, in the past and future, that Mattie Coleman would, in reasonable probability, have provided had she lived; (c) mental anguish, in the past and future, that Plaintiff will, in reasonable probability suffer as a result of Mattie Coleman's death; and (d) lost inheritance.

## Jury Demand

37. Plaintiff demands a trial by jury and tenders the appropriate fee herewith.

## Prayer

For these reasons, Plaintiff respectfully requests the Court enter judgment against Defendant for actual damages, exemplary damages, prejudgment and postjudgment interest, costs of suit and all other relief the Court deems appropriate.

Respectfully submitted,
**FAIRCHILD, PRICE, HALEY & SMITH, L.L.P.**

_____
Russell R. Smith
State Bar No. 18682310
1801 North Street
P.O. Drawer 631668
Nacogdoches, Texas 75963
Telephone: (936) 569.2327
Facsimile: (936) 569.7932
RSmith@fairchildlawfirm.com
**ATTORNEY IN CHARGE FOR PLAINTIFF, SHARON TEAL, INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF MATTIE COLEMAN**

**OF COUNSEL:**

**FAIRCHILD, PRICE, HALEY & SMITH, L.L.P.**
Christopher C. Hughes
State Bar No. 24074452
1801 North Street
P.O. Drawer 631668
Nacogdoches, Texas 75963
Telephone: (936) 569.2327
Facsimile: (936) 569.7932
CHughes@fairchildlaw.com


**WARE, JACKSON, LEE & CHAMBERS, LLP**

Paul W. Smith
State Bar No. 18662700
2929 Allen Parkway, 39th Floor
Houston, Texas 77019
Telephone: (713) 659.6400
Facsimile: (713) 659.6262
paulsmith@warejackson.com